R. C. GEORGE, d/b/a Capitol Coal Sales, Capitol Coal Sales, Inc.; and Raymond Asbury, et al., d/b/a Asbury Coal Company, Appellants

v.

James P. MITCHELL, Secretary of Labor, et al., and Joseph Campbell, Comptroller General, Appellees.

No. 15555.

United States Court of Appeals District of Columbia Circuit.

Argued May 6, 1960.

Decided June 23, 1960.

Petition for Rehearing En Banc Denied Sept. 8, 1960.

As Amended Oct. 14, 1960.

488

Messrs. Arthur G. Lambert, Washington, D. C., and Rourke J. Sheehan, Rockville, Md., for appellants. Mr. John P. Bankson, Jr., Washington, D. C., also entered an appearance for appellants.

Mr. David L. Rose, Attorney, Department of Justice, with whom Asst. Atty. Gen. George C. Doub, and Messrs. Oliver Gasch, U. S. Atty., Samuel D. Slade and Alan S. Rosenthal, Attorneys, Department of Justice, were on the brief, for appellees. Mr. Arthur H. Fribourg, Attorney, Department of Justice, also entered an appearance for appellees.

Before PHILLIPS, Senior United States Circuit Judge for the Tenth Circuit,* and BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

Appellants brought suit against the Secretary of Labor, certain of his subordinates, and the Comptroller General of the United States, seeking a declaratory judgment by the District Court that certain contractual arrangements they had made with the Atomic Energy Commission were not within the coverage of the Walsh-Healey Act, 49 Stat. 2036 (1936), as amended, 41 U.S.C.A. §§ 35–45, because in their view there were six individual contracts each for an amount less than $10,000.[1] They also sought an injunction to restrain the Secretary and the Comptroller General from placing their names on the list of persons ineligible, by reason of violation of the Walsh-Healey Act, to be awarded Government contracts.[2] The District Court ruled that it had jurisdiction of the controversy, Capitol Coal Sales v. Mitchell, D.C.D.C.1958, 164 F.Supp. 161, and later entertained motions by both parties for summary judgment. The court granted the Government's motion, holding on the merits that the individual arrangements in question in fact constituted a single contract for an amount greater than $10,000 and hence the Act applied, and alternatively that one of the separate agreements was for more than $10,000. This appeal followed.

Appellants urge reversal, saying that the District Court erred in its holdings on the merits. The Government contends that the District Court lacked jurisdiction because appellants lacked standing to sue and the United States was not joined as a defendant, but that if jurisdiction existed the case was correctly decided on the merits.

I.

On the jurisdictional point, we must consider the extent to which Subsection (c) of the Fulbright Amendment[3] to the Walsh-Healey Act has departed from the test of standing established in Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L. Ed. 1108. Dealing with a steel company's effort to enjoin the Secretary of Labor from establishing under the Walsh-

* Sitting by designation pursuant to Section 294(d), Title 28 U.S.Code.

1. The Act applies only to contracts "in any amount exceeding $10,000." 49 Stat. 2036 (1936), as amended, 41 U.S.C.A. § 35.

2. Section 37 of the Act provides:
"The Comptroller General is authorized and directed to distribute a list to all agencies of the United States containing the names of persons or firms found by the Secretary of Labor to have breached any of the agreements or representations required by sections 35–45 of this title. Unless the Secretary of Labor otherwise recommends no contracts shall be awarded to such persons or firms or to any firm, corporation, partnership, or association in which such persons or firms have a controlling interest until three years have elapsed from the date the Secretary of Labor determines such breach to have occurred." Id. at § 37.

3. 66 Stat. 308 (1952), 41 U.S.C.A. § 43a (c).

Healey Act certain wages as the prevailing minimum in a particular locality, the Supreme Court in Lukens denied standing because "no legal rights of respondents were shown to have been invaded or threatened." 310 U.S. at page 125, 60 S.Ct. at page 875. At that time there was no generally recognized procedure for reviewing determinations of the Secretary, and the Court noted particularly "the 'confusion and disorder' that can result from the delays necessarily incident to judicial supervision of administrative procedure developed to meet present day needs of Government and capable of operating efficiently and fairly to both private and public interests." 310 U.S. at pages 130–131, 60 S.Ct. at page 878. In making available judicial review of Walsh-Healey determinations, Subsection (c) of the Fulbright Amendment provides:

"Notwithstanding the inclusion of any stipulations required by any provision of sections 35–45 of this title in any contract subject to said sections, any interested person shall have the right of judicial review of any legal question which might otherwise be raised, including, but not limited to, wage determinations and the interpretation of the terms 'locality', 'regular dealer', 'manufacturer', and 'open market'." 66 Stat. 308 (1952), 41 U.S.C.A. § 43a(c).

Appellees maintain that this language was not intended to confer standing, but was designed merely to assure that contract stipulations required by Walsh-Healey would not preclude review in an enforcement proceeding brought by the Attorney General, which the Government says is the only proceeding contemplated by Congress. We disagree.

The legislative history of the Fulbright Amendment evidences a multiplicity of congressional purposes, including an intent (1) to overrule the Lukens case insofar as it pertained to the Walsh-Healey Act, (2) to provide a set of procedures by which the Secretary of Labor may construe and apply the Walsh-Healey Act, (3) to vitiate or modify the

effect of the Secretary's construction of the term "open market," and (4) to provide adequate judicial review of the Secretary's determinations. Nowhere does the legislative history suggest that Congress limited its consideration of judicial review to enforcement proceedings, or even that such proceedings were specifically considered. On the contrary, the original intent of Senator Fulbright, the circumstances of compromise which produced the ultimate Fulbright Amendment, the language of Subsection (c), the House Conference Report, and the case law all support the proposition that Subsection (c) of the Amendment authorizes persons situated as are the appellants here to seek declaratory or other relief. Senator Fulbright desired to overrule Lukens. See 98 Cong.Rec. 6246 (1952). The original Fulbright Amendment and the proposed Lehman Amendment would have permitted any person aggrieved plus certain other persons to obtain review of all general policy determinations prior to their implementation by the Secretary of Labor. See S. Rep. No. 1594, 82d Cong., 2d Sess. 36–37 (1952); Amendment by Senator Lehman to S. 2594, 82d Cong., 2d Sess. (June 3, 1952). A group including Senators Saltonstall, Morse, Bridges, Tobey, Ives, and Lodge rejected these amendments, but acquiesced in a substitute amendment by Senator Fulbright which eventually became law. See 98 Cong.Rec. 6530 (1952).

■ The Fulbright Amendment as enacted provides in Subsection (b) that the only general policy determinations reviewable prior to implementation are wage determinations. 66 Stat. 308 (1952), 41 U.S.C.A. § 43a(b). And only persons adversely affected or aggrieved are accorded standing. Ibid. But Subsection (c) provides that "any interested person shall have the right of judicial review of any legal question which might otherwise be raised, including, but not limited to, wage determinations and the interpretation of the terms 'locality', 'regular dealer', 'manufacturer', and 'open market'." 66 Stat. 308 (1952); 41

U.S.C.A. § 43a(c). Subsection (c) has reference to situations where a contract has been let of a sort covered (or alleged to be covered) by the Walsh-Healey Act. Thus, it would seem that under Subsection (c) the standard of "any interested person" is to replace the legal wrong criterion of Lukens, and "the right of judicial review of any legal question" is to be established once a dispute arises under a Government contract covered or alleged to be covered by the Walsh-Healey Act. The House Conference Report stated that the right might be exercised in "any appropriate proceeding." H.R.Conf.Rep. 2352, 82d Cong., 2d Sess. 27 (June 28, 1952). We have no doubt that a proceeding for declaratory judgment is appropriate and that appellants are interested parties. The Secretary has made a finding adverse to appellants, he threatens to place them on a Government blacklist, and no other adequate legal or administrative remedy is available. See Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; Stark v. Wickard, 1944, 321 U.S. 288, 309, 64 S.Ct. 559, 88 L.Ed. 733; but cf. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L. Ed. 834.

‌ Nor do we believe the suit should have been dismissed because the United States was an indispensable party and could not be joined. Insofar as the suit sought to prevent the Secretary of Labor, his subordinates, and the Comptroller General from blacklisting appellants, it was maintainable against them. To be sure, the Secretary's authority to blacklist is based on the same statute which authorizes the United States to collect liquidated damages, and appellant raises issues which apply equally to the power of the Secretary and the rights of the United States. "The government's interest must be determined in each case 'by the essential nature and effect of the proceeding, as it appears from the entire record.' " Mine Safety Appliances Co. v. Forrestal, 1945, 326 U.S. 371, 374, 694, 66 S.Ct. 219, 221, 90 L.Ed. 140. Where the effect of a private suit is to compel or increase the disbursement of public funds, as—for example— by preventing the Treasury from withholding challenged payments, courts have held the United States to be an indispensable party. Mine Safety Appliances Co. v. Forrestal, supra (withholding based on alleged excess profits) ; see also Stroud v. Benson, 4 Cir., 1958, 254 F.2d 448 (price supports). But where the suit is one to enjoin regulatory administrative action not involving disbursement of funds to a private claimant, the United States does not ordinarily have a sufficient interest to require joinder. See Block, Suits Against Government Officers and the Sovereign Immunity Doctrine, 59 Harv.L.Rev. 1060 (1946). This case falls in the latter category. If successful, the suit would not increase disbursements from the Treasury, and the threatened blacklisting, while perhaps not constituting a tort in the strict sense, would cause substantial injury to appellants in their business. In view of the expressed desire of Congress, through the Fulbright Amendment of 1952, to afford judicial review of legal questions arising under the Walsh-Healey Act, we think the decision in Reynolds Corp. v. Morse, 1949, 84 U.S.App. D.C. 420, 174 F.2d 159, affirming D.C. 1948, 81 F.Supp. 137, must be limited to the issue therein involved. We conclude, therefore, that the court had jurisdiction over the prayer for declaratory and injunctive relief.

## II.

Having jurisdiction, the trial court properly reached the merits of the case. Although declaratory relief in this case would not necessarily terminate the entire controversy, an injunction might have been appropriate to prevent irreparable injury to appellants by reason of the threatened blacklisting. If appellants did not come within the coverage of Walsh-Healey, blacklisting was improper, and was subject to being restrained. The United States District Court for the District of Columbia is an appropriate forum for such relief.

■ We would observe, however, that in future situations such as this the courts should be careful to guard against a multiplicity of litigation. An enforcement action against these appellants was brought by the Government under Section 2 of the Act in the United States District Court for the Eastern District of Tennessee shortly after this suit was originally brought in that District. The court in Tennessee transferred this case to the District of Columbia, and is holding the enforcement suit in abeyance pending the outcome of this case. It would have been possible to try most—if not all—the critical issues in the enforcement suit. The efficient administration of justice will ordinarily require that the District Court having jurisdiction over a suit for declaratory relief of the present sort stay its proceedings until the United States shall have had opportunity to institute and complete its enforcement proceeding, although a temporary restraining order preventing blacklisting pending the outcome of the enforcement action may, at times, be appropriate.[4] Since the District Court in Tennessee has stayed the enforcement proceeding to permit completion of the declaratory judgment suit here, and since the District Court for the District of Columbia has already considered the administrative record and the issues raised, we think that no useful purpose would be served by our declining at this time to rule on the legal questions presented.

■ On the merits, there is no dispute that the Atomic Energy Commission issued an offer to purchase 50,000 tons of coal, of certain specifications, in one or more lots, the minimum bid to be 1800 tons; that in response to this offer Capitol Coal Sales submitted six bids on separate forms; that each bid was for 1800 tons; that each bid named a different mine as the source of the coal to be supplied on that bid; that each bid stated the price per ton, but no total price was entered by the bidder on any bid form; that the bids were signed only in Capitol's name, and only by Capitol's proprietor-president (Mr. R. C. George) —holding Capitol out as the prime contractor and a regular dealer in coal—and that the intent of Capitol and the six mine operators actually mining the coal was to avoid the requirements of the Walsh-Healey Act. These six bids were accepted by the Commission on July 31, 1956. Five of the bids, when computed, were for between $9,000 and $10,000. The computed total of the sixth, that which named Asbury Coal Company as the source of the coal to be supplied, was originally $10,170—though appellants later attempted to reduce the amount.[5]

4. In this case, the District Court for the District of Columbia issued such an injunction, conditioning it by providing that none of the parties plaintiff should enter into any Government contract during the pendency of the order.

5. The Hearing Examiner and the District Court have found that the contract was for more than $10,000 and have thus rejected the claim that an effective reduction occurred. The evidence showed that the price originally stipulated for Asbury's coal was $5.65 per ton. On August 3, 1956—three days after the Atomic Energy Commission had accepted the bid from Capitol Coal Sales—the latter wrote the Atomic Energy Commission stating that a clerical error had been made and that the bid price should be $5.62 per ton. At $5.62 per ton, the total price on the Asbury lot would have been $10,116.00. On August 4, Asbury Coal received a check from Capitol Coal Sales in payment of the first delivery by Asbury at a rate of $5.45 per ton. This indicated that with at least a 15 cent per ton commission a contract had been let for more than $10,000. In response to an inquiry from Asbury, Capitol Coal Sales assured the supplier that everything would be straightened out, and on August 6 the bidder again wrote the Atomic Energy Commission, claiming another clerical error and seeking a reduction to $5.55 per ton. Later, the agreement was modified to provide for payment at that rate on the condition that the Government would not forfeit any rights of enforcement under the Walsh-Healey Act. Other testimony was introduced to show that under the circumstances it was improbable that merely a clerical error occurred. We cannot conclude that the Hearing Examiner and

The aggregate of the bids (as originally made) was $57,312.00. The evidence before the Hearing Examiner showed that Capitol Coal Sales acted as a middleman between the six individual suppliers of coal and the Atomic Energy Commission, and that insofar as Asbury Coal Company was concerned efforts to obtain a Government contract were initiated by Capitol Coal Sales. In addition, there was testimony that some of the mines named as sources of the coal to be supplied under the agreements between Capitol Coal Sales and the Atomic Energy Commission were of such character that the mine operator could not be certain that he could meet the demands required under the contract, and that in one case Capitol Coal Sales fulfilled the agreement through deliveries from another source. The proprietor-president of Capitol Coal Sales, Inc., also asserted by affidavit that "Many of [the] mines are operated by folks who can neither read nor write." Thus, Capitol's services were essential to bidding for a Government contract. If the bids had been made in the names of the mine operators, without the assumption of responsibility by Capitol and its proprietor-president, it is at least doubtful whether the bids would have been accepted.

The Hearing Examiner in the Division of Public Contracts, Department of Labor, found that one of the agreements (that relating to Asbury) was for more than $10,000, and that to effectuate the purposes of the Walsh-Healey Act all six agreements should be treated as a single contract executed with Capitol Coal Sales as prime contractor. By stipulation, liquidated damages on the agreement relating to Asbury Coal were found to be $1,100.70 and on the entire aggregated contract, $4,441.41. The Hearing Examiner also found that the Asbury mine was operated in violation of the Federal Mine Safety Code. He ordered all the plaintiffs in this action to pay jointly $1,100.70 as liquidated damages to the Treasurer of the United States, and that Capitol Coal Sales and Mr. R. C. George, the president of Capitol Coal Sales, Inc., pay the remaining $3,340.71.[6] He recommended that Mr. George, Capitol Coal Sales, and Capitol Coal Sales, Inc. be unconditionally blacklisted and that the individual proprietors of Asbury Coal and the Asbury Coal Company itself be blacklisted until the liquidated damages assessed against them were paid and until they complied with the Federal Mine Safety Code. The Acting Administrator of the Division of Public Contracts adopted the findings, order, and recommendation of the Hearing Examiner. On the Government's motion for summary judgment, the District Court found that the agreements in question constituted a single contract for more than $10,000, and that in fact the agreement relating to Asbury was for an amount in excess of $10,000.

Since the recommended blacklisting of Capitol and its proprietor was unconditional, and jurisdiction is founded on the agreement relating to deliveries from the Asbury mine, it might appear unnecessary for us to consider whether the six agreements—including those

the District Court erred as a matter of fact or law. United States v. Ozmer, 5 Cir., 1950, 181 F.2d 508, relied on by appellants, is clearly distinguishable: there the contract price was changed in a good faith effort to comply with OPA regulations.

6. In this suit, Capitol Coal Sales and Mr. R. C. George do not dispute their liability if the Walsh-Healey Act is applicable. As to the Asbury group, since the bid which involved their mine was properly held to be for more than $10,000; since they made direct deliveries to the Government under it; and since Capitol Coal was

clearly acting in their behalf as well as its own, we think that liability for liquidated damages in respect of that bid could properly be assessed jointly against the Asbury group and the Capitol group, even though the Asbury bid was properly held to be a part of the single larger contract aggregating $57,312.00. See 49 Stat. 2037 (1936), 41 U.S.C.A. § 36; compare United States v. Islip Machine Works, Inc., D.C.E.D.N.Y.1959, 179 F.Supp. 585, with United States v. Hudgins-Dize Co., D.C.E.D.Va.1949, 83 F.Supp. 593; cf. Walsh-Healey Act Regulations, 41 C.F.R. § 201.104 (1949), 41 U.S.C.A.Appendix, § 201.104.

which relate to the other individual suppliers—constitute a single contract. Nonetheless, we deem it appropriate to pass on that contention because the propriety of treating these agreements as a single contract is relevant to the amount of liquidated damages which can lawfully be claimed from the dealer (Capitol): if the agreements cannot be lumped as one contract Capitol may not be liable for liquidated damages on the agreements for less than $10,000. Thus, to defer consideration would hardly be conducive to the efficient administration of justice.

 We think the Walsh-Healey Act creates a presumption that the dealer or manufacturer who signs a public contract containing Walsh-Healey covenants is the contracting principal.[7] And where, as here, the dealer is in fact the contracting principal, he should not be permitted to evade the restrictions and covenants of the Walsh-Healey Act merely because of the number of sheets of paper on which he elects to submit his bids. Under circumstances such as those presented here, we think that the Secretary of Labor is warranted, for purposes of enforcing the Act, in aggregating individual agreements signed by the same dealer in response to a single invitation to bid on the procurement of a specified commodity. The Secretary of Labor has evidently so construed the Act

in the past.[8] More importantly, however, Walsh-Healey represents a general public policy that the Federal Government should procure and use only goods produced under safe and fair working conditions. Undoubtedly, the $10,000 minimum was designed both to enable small manufacturers to obtain Government contracts and to avoid administrative burdens. But here the Secretary obviously believes that the administrative burdens are inconsequential. In fact, to hold the dealer liable may have the effect of eliminating some administrative burdens by requiring the dealer to police his subcontractors. While Congress may have been concerned for the small businessman capable of sustaining the administrative burdens of bidding for and processing Government contracts, we do not think it intended to protect producers who could not independently perform these minimal contracting functions, and it certainly did not intend to encourage the development of a group of shielding middlemen who earn a significant portion of their livelihood by facilitating avoidance of a fundamental public policy—fair wages and safe working conditions.

For these reasons, the judgment of the District Court is

Affirmed.

---

7. One of the covenants required by the Act is that the *contractor* is a manufacturer or dealer. See 49 Stat. 2036 (1936), 41 U.S.C.A. § 35(a).

8. Section 3(e) (3) of Rulings and Interpretations No. 3 of the Walsh-Healey Act, revised as of April 30, 1956 [originally published as Section, 20(e) of Rulings and Interpretations No. 2], provides:

"Where a single award is made in an amount exceeding $10,000 on a single invitation, and for reasons of convenience several formal contracts are issued covering the award, each such contract is subject to the provisions of the Act, although each may happen to be for a sum *not exceeding $10,000.*"