**UNITED STATES of America,**
**Plaintiff, Appellant,**

v.

**NEW ENGLAND COAL AND COKE**
**COMPANY, Defendant, Appellee.**

**No. 6064.**

United States Court of Appeals
First Circuit.

Heard March 4, 1963.

Decided June 4, 1963.

David L. Rose, Atty., Dept. of Justice, with whom Joseph D. Guilfoyle, Acting Asst. Atty. Gen., W. Arthur Garrity, Jr., U. S. Atty., and Alan S. Rosenthal, Atty. Dept. of Justice, were on brief, for appellant.

Francis J. Vaas, Boston, Mass., with whom James S. Eastham, William M. Brady, Boston, Mass., John J. Glessner, III, and Ropes & Gray, Boston, Mass., were on brief, for appellee.

Before HARTIGAN and ALDRICH, Circuit Judges, and GIGNOUX, District Judge.

GIGNOUX, District Judge.

The United States of America appeals from a summary judgment dismissing its action against New England Coal and Coke Company for the recovery of damages claimed to be due the United States by reason of alleged violations of the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 et seq.

The Walsh-Healey Public Contracts Act, the pertinent portions of which are set forth in the margin,[1] provides that

---

1. 41 U.S.C.

"§ 35. *Contracts for materials, etc., exceeding $10,000; representations and stipulations*

"In any contract made and entered into by any executive department, independent establishment, or other agency or instrumentality of the United States, or by the District of Columbia, or by any corporation all the stock of which is beneficially owned by the United States (all the foregoing being hereinafter designated as agencies of the United States), for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000, there

only manufacturers and regular dealers [2] are eligible to bid upon government contracts for the manufacture or furnishing of materials and supplies in amounts exceeding $10,000, and that all such contracts shall contain certain representations and stipulations prescribing minimum labor standards to be observed with respect to "all persons employed by the contractor" in the performance of such contracts. This appeal presents the question of whether a regular dealer,

shall be included the following representations and stipulations:

"(a) That the contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract;

"(b) That all persons employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract;

"(c) That no person employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight hours in any one day or in excess of forty hours in any one week: *Provided*, That the provisions of this subsection shall not apply to any employer who shall have entered into an agreement with his employees pursuant to the provisions of paragraphs (1) or (2) of subsection (b) of section 207 of Title 29;

"(d) That no male person under sixteen years of age and no female person under eighteen years of age and no convict labor will be employed by the contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in such contract; and

"(e) That no part of such contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection."

"§ 36. *Same; liability for breach; cancellation; completion by Government agency; employee's wages*

"Any breach or violation of any of the representations and stipulations in any contract for the purposes set forth in section 35 of this title shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of such contract, the sum of $10 per day for each male person under sixteen years of age or each female person under eighteen years of age, or each convict laborer knowingly employed in the performance of such contract, and a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of such contract; and, in addition, the agency of the United States entering into such contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of said contract set forth in section 35 of this title may be withheld from any amounts due on any such contracts or may be recovered in suits brought in the name of the United States of America by the Attorney General thereof. * * * "

2. The General Regulations under the Act, 41 C.F.R. 50–201, define the requirements which a contractor must satisfy if he is to qualify as a "manufacturer" or a "regular dealer" in the following terms:

"41 C.F.R. § 50–201.101 *Manufacturer or regular dealer.*—A bidder or contractor shall be deemed to be a 'manufacturer' or 'regular dealer' within the meaning of the stipulation required by section 1(a) of the Act and section 50–201.1(a) if he falls within one of the following categories:

"(a) A manufacturer is a person who owns, operates, or maintains a factory

who contracts as such to furnish goods to the government, is responsible for the failure of its suppliers to comply with Walsh-Healey standards with respect to the employees of the suppliers.

The basic facts were found by a Department of Labor hearing examiner,[3] and are not in dispute. New England has been a regular dealer in coal since its organization in 1905. It purchases coal from mines in coal-mining states, has the coal transported by ship to its docks in Boston Harbor, and delivers coal from its stockpiles there to industrial and commercial consumers in the New England area.

In the normal course of its business, New England successfully bid upon and was awarded four contracts with the government to supply coal, of a type known as Beacon Stoker, to various government installations in the Boston area during the period January 1, 1957 through June 30, 1959. Each contract represented that New England was a regular dealer in coal,[4] and contained the other representations and stipulations required by the Walsh-Healey Act. Each contract also specified that the coal was to be obtained by New England from "Mary Frances No. 7" mine, which was owned by the Mary Frances Coal Company, of Pax, West Virginia.[5]

New England issued purchase orders to the Mary Frances Coal Company, which was one of its regular suppliers, for the amount of coal called for by the government contracts. Mary Frances was in no way affiliated with New Eng-

land or subject to its control. To fill these orders Mary Frances obtained the coal which it sold to New England from three sources: (1) from its own Mary Frances No. 7 mine, produced by its own employees; (2) from so-called "contractors," who mined coal on mining properties leased from Mary Frances; and (3) from other suppliers, who operated mines on other properties not owned by Mary Frances. Mary Frances collected, mingled and processed the coal from all these sources at its tipple at Willis Branch, West Virginia, for sale to New England and other customers in the normal course of its business. The coal sold to New England was shipped by railroad to the coast and from there by coast-wise colliers to New England's stockpiles in Boston. In addition, the Beacon Stoker coal from New England's other sources was mingled during shipment and in the stockpiles from which it made deliveries to the government.

The Beacon Stoker coal in New England's stockpiles was of the grade and quality required by the government contracts, although only a small percentage had in fact been secured from Mary Frances No. 7 mine. During the period in question, only 6.86% of this coal was purchased from Mary Frances, and the remaining 93.14% was obtained from fifteen other producing mines. The coal from all sources was intermingled. During the same period, only 11.64% of New England's total deliveries from its Beacon Stoker stockpiles went to the government.

or establishment that produces on the premises the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications.

"(b) A regular dealer is a person who owns, operates, or maintains a store, warehouse, or other establishment in which the materials, supplies, articles, or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and sold to the public in the usual course of business."

3. New England Coal & Coke Co., 14 BNA WH Cas. 783 (H.E.1960), aff'd, 15 BNA WH Cas. 250 (Admr.1961).

4. New England clearly qualified as a "regular dealer" under the Act, and in the administrative proceedings it was stipulated "at the time of these contracts and the performance of them that New England Coal and Coke Company was, and is, a regular dealer in coal, and was awarded the contracts as such."

5. The schedules for coal which accompanied the bid invitations required the bidder to indicate thereon the mines from which the bidder would obtain the coal.

The basis of the government's complaint (in this action and in the administrative proceedings) is that certain employees of the contractors and suppliers who furnished the raw coal to Mary Frances were not paid in accordance with the minimum wage and overtime requirements of the Walsh-Healey Act and that their working conditions did not meet the Act's health and safety standards.[6] The theory on which the government relies is that the Walsh-Healey stipulations agreed to by New England applied to the employees of these contractors and suppliers, as well as to New England's own employees. On cross-motions for summary judgment, based upon the administrative record, the district court entered judgment for New England on the ground that the employees of such contractors and suppliers were not "persons employed by the contractor" within the meaning of the Walsh-Healey Act, and that accordingly the Walsh-Healey stipulations agreed to by New England did not apply to them. The sole issue presented by this appeal is the correctness of this ruling.

The heart of the government's case is its contention that the phrase "all persons employed by the contractor" as used in the Walsh-Healey Act includes all persons "utilized" by the contractor in the performance of his contract, and is not limited to the contractor's own employees. From this, the government goes on to argue that the employees of Mary Frances' suppliers were persons utilized

by New England in the performance of its contracts, since the coal furnished by New England to the government included coal shipped to New England by Mary Frances, at least some of which was produced by Mary Frances' substandard suppliers.[7]

We cannot agree. In our view, the interpretation suggested by the government runs contrary to the plain meaning of the language of the Act, the clear intent of Congress as manifested by the Act's legislative history, and any reasonable interpretation of the regulations and rulings issued under the Act. We also deem it significant that although the Act has been in effect since 1936, the government has cited no administrative or court decision which squarely supports its position.

Established principles must guide us in our construction of the Walsh-Healey Act as it applies to the issue raised by this appeal. "In matters of statutory construction the duty of this Court is to give effect to the intent of Congress, and in doing so our first reference is of course to the literal meaning of words employed." Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958). Unless the contrary appears, it is presumed that statutory words were used in their ordinary sense. Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Massachusetts Protective Ass'n, Inc. v. United States, 114 F.2d 304, 310–311 (1st Cir. 1940). A primary consid-

6. It is conceded that many of Mary Frances' contractors and suppliers did not in fact comply with the minimum wage, maximum hour and health and safety requirements of the Walsh-Healey Act. Mary Frances itself was a complying producer.
In the administrative proceedings the government contended that Mary Frances and its president, as well as New England, were liable for such alleged violations. The hearing examiner held New England alone liable. 14 BNA WH Cas. 783 (1960). The Administrator affirmed the decision against New England, while expressing no opinion with respect to Mary Frances and its president on the ground

that the government had not appealed that portion of the hearing examiner's decision. 15 BNA WH Cas. 250 (1961).

7. The hearing examiner held that New England could not rely as a defense on the failure of the government to prove the actual delivery of any "substandard" coal under the contracts, because the inability of the government to do so resulted from New England's commingling of such coal with coal from other sources —an alleged breach of its contracts—and also from its failure to keep records required by Regulations § 50–201.501(c). 14 BNA WH Cas. at 790.

eration is "the mischief to be corrected and the end to be attained" by the enactment of the legislation, Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L. Ed. 254 (1934); United States v. Silk, 331 U.S. 704, 713, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 124, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); and, where possible, its terms should be construed to give effect to the Congressional intent. Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962); United States v. Silk, supra; N. L. R. B. v. Hearst Publications, Inc., supra; United States v. Darby, 312 U.S. 100, 115, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Extrinsic aids such as the legislative history of the Act, United States v. Wise, 370 U.S. 405, 414, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); Flora v. United States, 362 U.S. 145, 151, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960); Porter v. Murray, 156 F.2d 781, 785 (1st Cir. 1946), appeal dismissed sub nom., Murray v. Fleming, 330 U.S. 804, 67 S.Ct. 963, 91 L.Ed. 1262 (1947), and the accepted interpretation of similar language in related legislation, cf., Rutherford Food Corp. v. McComb, 331 U.S. 722, 723, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), are helpful in interpreting ambiguous statutory language. Finally, administrative interpretations by the agency entrusted with the enforcement of the statute are persuasive. Federal Housing Administration v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L. Ed.2d 132 (1958); N. L. R. B. v. Hearst Publications, Inc., supra, 322 U.S. at 130–131, 64 S.Ct. at 860–861. However, the power to issue regulations is not the power to change the law, and it is for the courts, to which the task of statutory construction is ultimately entrusted, to determine whether or not administrative interpretations are consistent with the intent of Congress and the words of the Act. Social Security Board v. Nierotko, 327 U.S. 358, 368–370, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Panama Refining Co. v. Ryan, 293 U.S. 388, 428–429, 55 S.Ct. 241, 79 L.Ed. 446 (1935); Commissioner of Internal Revenue v. Winslow, 113 F.2d 418, 423, 133 A.L.R. 405 (1st Cir. 1940).[8]

■ With these principles in mind, we turn to a construction of the statutory phrase "all persons employed by the contractor" in the context of the Walsh-Healey Act. The purpose of the Act is not disputed. At a time when Congress was deeply concerned with the improvement of working conditions, the governmental policy of awarding contracts to the lowest bidder favored the sweat-shop operator and the bid broker.[9] Congress passed the Walsh-Healey Act in order to prevent the use of public funds to depress working conditions, and instead "to use the leverage of the Government's immense purchasing power to raise labor standards." Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 507, 63 S.Ct. 339, 342, 87 L.Ed. 424 (1943); Perkins v. Lukens Steel Co., 310 U.S. 113, 128, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). The principal methods adopted by Congress to advance its purposes were to limit the award of contracts for amounts in excess of $10,000 to established manufacturers and regular dealers, and to require of each contractor an undertaking to maintain certain minimum labor standards with respect to persons "employed by" him in the manufacture or furnishing of goods under the contract.

No definition of the term "employed by" is contained in the Act. However, the statute contains no indication that the term should be given other than its normal meaning, or that it does not con-

---

8. For a discussion of the principles of statutory construction generally see Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947); Note, Re-evaluation of the Use of Legislative History in the Federal Courts, 52 Colum.L.Rev. 125 (1952); Hart and Sachs, The Legal Process, 1410–17 (Tentative ed. 1948).

9. A bid broker was a person other than a legitimate dealer or manufacturer who submitted bids so low that established firms could not compete for the contract. In turn, the bid broker sublet portions of the contracts to sweat shops and substandard factories. H.R.Rep. No. 2946, 74th Cong., 2nd Sess. 4 (1936).

template the presence of *any* of the indicia of an employment relationship to which the courts have generally referred in determining the existence of such a relationship. See Restatement (Second), Agency § 220 (1958). Certainly, the language utilized by Congress contains no suggestion of an intention to obliterate entirely the distinction between an employee and an independent contractor. Such terms as "employ", "employee", "employer", and "employed by" have on numerous occasions been interpreted in the context of similar social legislation. N. L. R. B. v. Hearst Publications, Inc., supra (National Labor Relations Act); United States v. Silk, supra (Social Security Act); Rutherford Food Corp v. McComb, supra (Fair Labor Standards Act). Despite the broad scope given to the employment relationship for the purposes of these statutes, we find no case which has extended the coverage of these acts to include a relationship as attenuated as that between New England and the employees of Mary Frances' suppliers and contractors. While these words have been consistently held to contemplate a relationship broader than the master-servant relationship as defined at common law, their scope has never been extended to embrace bona fide independent contractors and their employees.

Applicable also to our consideration of the Walsh-Healey Act is what the Supreme Court said with reference to the Social Security Act in United States v. Silk, supra. The court there noted that it was not the purpose of Congress to make the Act cover the whole field of service to every business enterprise by including as employees all persons who rendered service to an industry. 331 U.S. at 711–712, 67 S.Ct. at 1467–1468; N. L. R. B. v. Hearst Publications, Inc.,

supra, 322 U.S. at 124–125, 64 S.Ct. at 857–858. The court then significantly stated (331 U.S. at 714, 67 S.Ct. at 1468):

"There is no indication that Congress intended to change normal business relationships through which one business organization obtained the services of another to perform a portion of production or distribution. Few businesses are so completely integrated that they can themselves produce the raw material, manufacture and distribute the finished product to the ultimate consumer without assistance from independent contractors. The Social Security Act was drawn with this industrial situation as a part of the surroundings in which it was to be enforced. Where a part of an industrial process is in the hands of independent contractors, they are the ones who should pay the social security taxes."

Admittedly, the construction which the government urges upon us would extend the coverage of the Act, and to that extent further effectuate the policy of Congress in enacting the legislation. However, by no recognized concept can New England and Mary Frances be said to have had an employer-employee relationship. Even less, can such a relationship be said to have existed between New England and the employees of Mary Frances' contractors and suppliers. If Congress in its use of the phrase "employed" had meant "utilized", it could easily have said so. Congress not having done so, we find such an unorthodox construction not easy to imply.[10]

Were there any doubt as to the meaning of the language used by Congress in the Act itself, the legislative history

10. We do not read the language of the last, or health and safety, stipulation, 41 U.S.C. § 35(e), note 1 supra, as the government contends, as indicating a Congressional intent to extend the Act's coverage to the employees of independent suppliers. First, it is highly improbable that this stipulation was meant to have broader application than the others, which specifically apply only to persons "employed by the contractor". Second, the stipulation in terms applies only to employees "engaged in the performance of said contract". By no reasonable construction can the employees of a regular dealer's supplier, who are engaged simply in the production for the supplier of goods which are then shipped by the sup-

of the Act leads inescapably, we think, to the conclusion that Congress did *not* intend to make the contractor responsible for the labor standards of his suppliers. Section 1–A of the original bill, as passed by the Senate, S. 3055, 74th Cong., 1st Sess. (1935), required a prime contractor to obtain written representations or agreements from its suppliers that they would conform to the labor standards of the Act. Following hearings before the House Judiciary Committee, the bill was revised and reintroduced during the following session of Congress as H.R.11554, 74th Cong.,. 2nd Sess. (1936). Hearings before a Subcommittee of the House Committee on the Judiciary, 74th Cong., 2nd Sess., ser. 12, pts. 1 and 2, at 121–24 (1936). Under Section 2 of this bill, the prime contractor was responsible for the conduct of its suppliers and subcontractors but could shift responsibility for their compliance with the labor stipulations by giving them actual notice of the representations with respect to conditions of employment required by the Act. Representatives of business pointed out the practical difficulties imposed on a prime contractor by the application of the stipulations to the work of suppliers and subcontractors, including the necessity of segregating those supplies produced in conformity with the Act from those which were not. Hearings, supra at 241–43, 303, 358. On the other hand, the Secretary of Labor and representatives of labor opposed the provision permitting the prime contractor to escape responsibility merely by notifying its subcontractors or suppliers. Hearings, supra, at 212, 223. Following these hearings, the committee redrafted the original Senate bill in substantially its present form. The House Report which accompanied the bill made clear that the activities of suppliers were not within the coverage of the Act: "The bill as reported by the committee omits several features of the Senate bill to which serious objection was raised. It has not attempted to * * * lay down conditions for persons furnishing supplies to public contractors." H.R.Rep.No.2946, supra note 9, at 4.[11]

Our conclusion that the Act does not make a regular dealer responsible for the labor standards of its suppliers is entirely consistent with any reasonable interpretation of the applicable regulations and rulings issued under the Act.[12] In fact, two provisions in the regulations and rulings would appear at least to imply an affirmative administrative recognition that the prime contractor is not ordinarily responsible under the Act for the labor standards of its suppliers. Thus, the regulations grant an exemption for certain coal dealers who do not qualify as regular dealers, and for that reason would not otherwise be eligible for government contracts, provided that such a dealer agrees to be liable for

plier to the dealer, be said to be "engaged in the performance of" the dealer's contract with the government.

Nor do we find any merit in the government's argument that the convict labor stipulation, 41 U.S.C. § 35(d), note 1 supra, supports its interpretation. When a contractor makes use of convict labor, the resulting relationship is identical, in all respects material here, to the normal employer-employee relationship. Cf., Restatement (Second), Agency § 224 (1958).

11. The House report also makes the following statement:
"Section 1 (now 41 U.S.C. § 35) provides * * * that *he* (the contractor) pay not less than the prevailing wages for persons employed in the industry or similar industries operating in the locality, that *he* permit no person to work in excess of eight hours in any one day or forty hours in any one week, and that *he* employ no persons under eighteen years of age nor any convict labor * * *." H.R.Rep. No. 2946, supra note 9, at 4. (Emphasis added.)

12. These are the General Regulations under the Walsh-Healey Public Contracts Act, 41 C.F.R. § 50–201, as amended, which were originally issued by the Secretary of Labor September 14, 1936 under authority contained in Section 4 of the Act, 41 U.S.C. § 38, and Rulings and Interpretations No. 3 under the Act, dated October 1, 1945, and released by the Secretary of Labor and the Administrator of the Public Contracts Division January 31, 1946.

observance of Walsh-Healey Act standards in its supplying mines.[13] Such an undertaking would be wholly unnecessary if the government's present interpretation of the Act were correct and the contracting dealer in all cases were liable as a guarantor of the labor standards of its suppliers. Similarly, the so-called "subcontractor" provision of the rulings provides that a manufacturer shall not be liable for the labor standards of its suppliers where it is the regular practice of the industry to purchase from suppliers, rather than to manufacture, materials to be used in manufacturing the commodity required by the government contract.[14] This provision would seem to constitute at least a partial administrative recognition that the normal application of the Act does not extend beyond the prime contractor's own employees.

■ The government strenuously urges upon us that the so-called "substitute manufacturer" and "direct shipment" provisions of the regulations and rulings indicate a "consistent administrative interpretation" of the Walsh-Healey stipulations as applying to persons other than the contractor's own employees, an interpretation which it argues should not be overturned except for the most compelling reasons. See Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933). By the "substitute manufacturer" provision, a contractor who shifts all or part of the work of the contract to another is made jointly liable with the party to whom the work is shifted for any failure of the latter to comply with the labor standards of the Act.[15] The "direct shipment" provision imposes liability on a regular dealer's supplier, even though not a signatory to the contract, who ships the articles required by the contract directly to the

13. Regulations Sec. 50–201.604(a), which reads:

"(a) Contracts with a person who regularly buys and sells coal on his own account in lots of not less than a cargo or railroad carload, or with a person who is authorized by one or more persons engaged in mining coal to negotiate and conclude contracts for the furnishing thereof in such lots, are exempt from the requirement of section 1(a) of the act and § 50–201.1 of this part that such person represent that he is a manufacturer or a regular dealer in coal: *Provided, however*, That all the following terms and conditions are met: (1) That such person will notify the persons engaged in mining the coal that the purchaser thereof is the United States and that provisions of the Public Contracts Act are applicable; and (2) That such person, apart from the liability of the mines, shall be liable for the observance in the mines of all the labor standards provided in section 1 of the act; and (3) That such person notify the contracting agency that he will accept the contract upon the terms and conditions set forth above."

14. Section 30(a), Rulings and Interpretations No. 3, which provides:

"(a) If a manufacturer buys materials, supplies, articles, or equipment to be used in manufacturing the commodities required by the Government contract, and if it is the regular practice in the industry engaged in the manufacture of the commodities called for by the contract to purchase such materials, supplies, articles, or equipment and not to manufacture them, the vendor of such goods is considered a 'subcontractor' and the work performed by him is not deemed subject to the Public Contracts Act. Under like circumstances, the performance of services (for example, machining operations) by one other than the primary contractor, is not considered work subject to the Public Contracts Act."

15. Section 32(a) Rulings and Interpretations No. 3, which reads:

"(a) When a contractor undertakes a contract subject to the Public Contracts Act, he assumes an obligation to manufacture or furnish the commodities required under the labor standards of the Act. He may not relieve himself of this obligation merely by shifting the work to another. If, for example, a contractor is awarded a contract subject to the Act as a manufacturer, that contractor is liable jointly with the substitute manufacturer for any acts or omissions on the part of a substitute manufacturer which would have constituted violations of the contractor's contract if he had performed the contract in his own plant and had committed such acts or suffered such omissions in connection with that performance."

government.[16] In our view, the "substitute manufacturer" and "direct shipment" provisions of the regulations and rulings deal with two situations in which the stipulations are applied to the employees of the contractor's suppliers in order to prevent evasion by the prime contractor of its Walsh-Healey obligations. As such they represent exceptions to the normal application of the stipulations, which may be justified under recognized evasion of contract principles.[17] On the record before us, we are not faced with any claim that New England acted in bad faith or with any intent to evade its Walsh-Healey obligations.

In each of the administrative decisions cited by the government,[18] application of the Walsh-Healey stipulations to persons other than the contractor's own employees was justified in terms of either the "substitute manufacturer" or the "direct shipment" exception.[19] In no case was the decision based on a holding that the employees of independent suppliers were "persons employed by the contractor" within the meaning of the

16. Section 34(a), Rulings and Interpretations No. 3, which provides:
"(a) Whenever a dealer, to whom a contract within the Act and Regulations has been awarded, causes a manufacturer to deliver directly to the Government the materials, supplies, articles, or equipment required under the contract, such dealer will be deemed the agent of the manufacturer in executing the contract. As the principal of such agent the manufacturer will be deemed to have agreed to the stipulations contained in the contract.—Regulations, section 50–201.104."

17. The "direct shipment" provision does not in terms affect the liability of the contractor, but establishes the basis upon which the nonsignatory supplier is held liable for violation of the Act's stipulations. Cardinal Fuel & Supply Co., 15 BNA WH Cas. 120, 132 n. 8 (H.E.1961), aff'd, 15 BNA WH Cas. 254 (Adm'r 1961). In such circumstances, however, the prime contractor has been held jointly liable for Walsh-Healey violations by his supplier on the theory that, by causing his supplier to furnish the contract goods directly to the government, he has "shifted the work of the contract" to his supplier within the meaning of the "substitute manufacturer" provision. E.g., Cardinal Fuel & Supply Co., supra at 132; Southern Ill. Co-op. Coal Sales Co., 13 BNA WH Cas. 558, 560 (H.E.1958). Moreover, the dealer, as agent for the manufacturing supplier, is, under traditional concepts of agency law, responsible to contracting third parties for his principal's violation of the contract. Restatement (Second), Agency § 322 (1958). Cardinal Fuel & Supply Co., supra at 132 n. 8.

18. Cohen-Fein, 6 BNA WH Cas. 1116 (Adm'r 1940); Admoor Clothes, 6 BNA WH Cas. 1073 (Adm'r 1944); Lyon & Borah, 8 BNA WH Cas. 566 (H.E.1949); Negri, 9 BNA WH Cas. 578 (Sec. 1950); Golden State, 9 BNA WH Cas. 164 (H.E. 1949), aff'd, 10 BNA WH Cas. 153 (Adm'r 1951); Elmvale Dye Works, 10 BNA WH Cas. 380 (H.E.1951); Coal Creek Co., 11 BNA WH Cas. 299 (H.E. 1952), aff'd, 11 BNA WH Cas. 563 (1953); Better Box Co., 12 BNA WH Cas. 90 (H.E.1953), aff'd, 12 BNA WH Cas. 123 (Adm'r 1954); Midland Coal Corp., 12 BNA WH Cas 151 (H.E.1954), aff'd, 13 BNA WH Cas. 909 (Sec. 1955); Capitol Coal Sales Inc., 13 BNA WH Cas. 296 (1957), aff'd, 13 BNA WH Cas. 717 (Adm'r 1958), aff'd, sub nom, George v. Mitchell, 108 U.S.App.D.C. 324, 282 F. 2d 486 (D.C.Cir. 1960); Southern Ill. Co-op. Coal Sales Co., supra note 17; McPherson, 13 BNA WH Cas. 743 (H.E. 1958), aff'd, 13 BNA WH Cas. 763 (Adm'r 1958); Adams, 14 BNA WH Cas. 354 (H.E.1959); Summers, 14 BNA WH Cas. 546 (H.E.1959), aff'd, 14 BNA WH Cas. 682 (Adm'r 1960); Cardinal Fuel & Supply Co., supra note 17; McCall Coal Co., 15 BNA WH Cas. 400 (H.E. 1961), aff'd, 15 BNA WH Cas. 411 (Adm'r 1961). Maryland Coal & Coke Co., 15 BNA WH Cas. 90 (H.E.1961), also cited by the government, should be disregarded because it was decided by Hearing Examiner Parkinson after he rendered the first administrative decision in this action.

19. Additionally, in Midland Coal Corp., Capital Coal Sales, Inc., Summers, Cardinal Fuel and Supply Co., and McCall Coal Co., all supra note 18, the contractor could not qualify as a regular dealer and had acted simply as a sales agent for the supply mines, in executing the contract with the government. The government has made no claim in this case that New England entered into its contract as agent for Mary Frances, and not as a regular dealer.

148

Act.[20] The only court decision cited by the government in support of its position, George v. Mitchell, 108 U.S.App.D.C. 324, 282 F.2d 486 (D.C. Cir. 1960), is clearly not in point. In that case the contractor could not qualify as a regular dealer, and in contracting with the government had acted simply as agent for the producing mines, which apparently shipped the coal involved directly to the government. See note 19, supra. Furthermore, the only issue presented to the Court of Appeals, as in the administrative proceedings, was whether the multiple contracts involved, each of which was for less than $10,000, could be considered as a single contract under the Act.

 There remains for consideration only the government's contention that the designation of the Mary Frances No. 7 mine in New England's contracts expanded the "work of the contract" which New England agreed to perform to include the manufacture or production of the coal, and that hence New England must be held liable under the "substitute manufacturer" provision of the regulations and rulings, because it "shifted the work of the contract" to Mary Frances and its suppliers.[21] Even if, as New England strenuously denies,[22] specification of the supplying mine meant that only coal from Mary Frances No. 7 should have been delivered to the government and that failure to conform to the specification was a breach of contract which would have justified rescission of the contract by the government,[23] we reject the suggestion that this provision can reasonably be interpreted as having expanded the "work of the contract" so as to include the mining and processing of the coal. New England entered into its contracts as a regular dealer, and in the performance of its contracts it acted at all times as a regular dealer. The only reasonable interpretation of the contracts is that both parties contemplated the "work of the contract" to be the furnishing of coal by New England from its stockpiles in Boston Harbor, and not the mining and processing of the coal by Mary Frances in West Virginia. Under these circumstances we can see no basis for the government's claim that by specifying the source of the coal it undertook to furnish the government, New England thereby undertook responsibility for its manufacture or production.[24]

 We conclude that the Walsh-Healey Act does not make a contractor, who enters into a contract to furnish goods to the government as a regular dealer and operates as such in the performance of its contract, responsible for the labor standards of its suppliers. Ac-

20. In Golden State, supra note 18, the hearing examiner imposed liability on the contractor squarely on the "direct shipment" exception. 9 BNA WH Cas. at 174. In affirming the hearing examiner's decision, the Administrator stated, " * * * the language 'no person employed by the contractor' can only mean 'no person employed at the instance of the contractor' if the statutory purpose is to be preserved." This language was clearly dictum.

21. This was in fact the basis of the rulings against New England by the hearing examiner and the administrator in the administrative proceedings. 14 BNA WH Cas. at 785–86, 15 BNA WH Cas. at 253.

22. New England argues that the purpose of specifying the supplying mine was simply to insure that coal of the proper grade, quality and quantity would be available for delivery to the government under the contracts.

23. Section 3(a) of the "General Provisions for Coal Contracts" provides:
"(a) Coal from mines other than those stated in the Schedule shall not be furnished unless previously authorized by the Contracting Officer in writing. Coal shipped in violation of this section may be rejected by the Government and in addition the contract may be terminated for default pursuant to the provisions of Section 15, Termination for Default."
The government at no time claimed a breach of contract because of the delivery by New England of coal from sources other than Mary Frances No. 7 mine.

24. While unnecessary to our decision, an analysis of certain statistics in this case will illustrate how unrealistic is the government's position. It is undisputed that the type and quality of the Beacon Stoker coal supplied by New England to the government measured up in all re-

-cordingly, we hold that New England is not liable for the failure of Mary Frances' suppliers to comply with the labor standards of the Act.[25]

A judgment will be entered affirming the judgment of the district court.

ALDRICH, Circuit Judge (concurring).

I concur in the opinion of the court, but in the light of the dissenting opinion wish to add a few comments.

No evidence was offered as to why the government requested New England to designate the mine from which it proposed to obtain its coal. I think if any inference is to be drawn it is that the government was there concerned with the quality of the product. This inference seems supported by the fact that the contract reserved to the government the right to demand a price reduction if some other mine was substituted. This is a far cry from Walsh-Healey compliance.

It is common ground that there was no evidence that the government possessed any knowledge as to whether the Mary Frances mine met the provisions of the act. Compliance may be a complicated matter, and I do not think, in the absence of evidence, we should assume that the contracting officers of the government had such knowledge. If they did, this was a matter peculiarly appropriate for the government to prove, particularly in a case where the burden of proof was up-on the government. Furthermore, this seems a very dangerous argument. Suppose, on further study, it had appeared that Mary Frances itself was a non-complying producer. Could it be said that in accepting Mary Frances the government had accepted whatever conditions were there in effect, and had made the Walsh-Healey Act, otherwise applicable, inapplicable? I do not think the fundamental issue involved in this case is to be determined by the naming or non-naming of some particular mine.

It may be conceded that the result in this case limits the application of the Congressional purpose to maintain wages evidenced by the act, if the act had that broad a purpose. However, I suggest this assumes the point. Congress is not a single voice, but a combination of voices. It is obvious that different Congressmen represent different interests, geographically, politically and economically, and that much legislation is a compromise between their different points of view. Individual Congressmen may accept a policy or purpose if, but only if, it has particular limits.

Putting this another way, absent ambiguity, and the dissent points to none, I think that the scope of the act is to be defined by what it says, and not by its believed beneficial purposes. The fact that a doctor prescribes one spoonful of medicine does not mean that he would prescribe a second.

spects to coal produced in the Mary Frances No. 7 mine. However, 93.14% of all the coal in New England's Boston stockpiles came from other producers, who, so far as appears, complied with the Act. Mary Frances itself complied, and it was only some of the mingled coal purchased by Mary Frances that came from sub-standard mines. Thus, something less than 6.86% of New England's Boston stockpiles came from non-complying producers. The government seeks to charge New England, on the theory that it kept no adequate records (without suggesting how possibly it could have kept such records without abandoning its normal operations) with having delivered all the non-complying coal to the government, even though, admittedly, the government received only 11.64% of the total Boston stockpiles. It is difficult to believe that in referring to "employees" Congress was seeking to impose upon a regular dealer the obligation to trace the source of every pound of coal delivered to the government from its stockpiles. For this defendant to have done so would seem impossible. Yet the effect of its not doing so, in the government view, would be to require all coal in its stockpiles to come from complying producers even though the government took only one tenth of it. Under such circumstances it would seem meaningless to be a "regular dealer."

25. In view of our conclusion, we need not consider the alternative defenses asserted by New England to the government's claim.

Judge GIGNOUX concurs in this opinion.

HARTIGAN, Circuit Judge (dissenting).

I am constrained to dissent from the result which the majority opinion achieves. Here New England Coal and Coke Company entered into a contract to supply coal to the Government. The contract contained the express provision that the coal to be supplied was to come from Mary Frances #7 mine. No other mine was named as a supplier in the contract. The contract provided, *inter alia*, that:

"Section 3.—Mines

"(a) Coal from mines other than those stated in the Schedule *shall not be furnished unless previously authorized by the Contracting Officer in writing.*

\* \* \* \* \* \*

"(b) The Government reserves the right to add *or to refuse to add additional mines other than those shown in the schedule* and upon which award of contract was made. The Government reserves the right to require consideration by way of price reduction when additional mines are added to the Schedule at the request of the contractor." (Emphasis supplied.)

There is nothing in the record showing that there was any authorization by the Government—written or oral—that the coal to be supplied under this contract could come from a source other than Mary Frances #7. This mine was in compliance with the provisions of the Walsh-Healey Act and we may assume that this was known to the Government at the time that it approved Mary Frances #7 as the source of the coal.

Under these circumstances, I would have no hesitancy in holding New England liable for the failure of Mary Frances' suppliers to comply with the Act. It seems to me that—under the facts of this case—the majority's view is in conflict with the purpose of the Act. Under the Act, the Government has the right to demand that the coal supplied to it be produced under specified conditions relating to wages and working conditions. Here it sought to implement this right by entering into a contract with a "dealer"—naming a specific supplier—both comporting with the fair labor standards of the Walsh-Healey Act. Thereafter, the supplier named in the contract immediately turns around and hands over a significant portion of the work to be done under the contract to other suppliers which do not comply with the Act.

Although there is no question of New England's good faith involved here, I can perceive no difference in kind between the situation involved here and that of the now banished "bid broker" whose demise was one of the conceded purposes of the Act. Consequently, I believe that the court's opinion is an invitation to "facilitating avoidance of a fundamental public policy—fair wages and safe working conditions." George v. Mitchell, 108 U.S.App.D.C. 324, 282 F.2d 486, 493 (D.C.Cir.1960).