UNITED STATES of America,
Plaintiff-Appellant,

v.

P & D COAL MINING CO., Inc.,
Defendant-Appellee.

No. 16349.

United States Court of Appeals
Sixth Circuit.

March 28, 1966.

Walter H. Fleischer, Dept. of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., William E. Scent, U. S. Atty., Louisville, Ky., on brief, for appellant.

John P. Sandidge, Louisville, Ky., Fielden Woodward, Woodward, Hobson & Fulton, Louisville, Ky., on brief, for appellee.

Before PHILLIPS and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The above cause came on to be heard on the record and briefs of the parties,

Phillips, Circuit Judge, dissented.

and the argument of counsel in open court. It appears that a contract was entered into between the National Lead Company and the P & D Coal Mining Company, in which it was agreed that, for a certain price, the Coal Company would deliver coal which was to be used by the United States Atomic Energy Commission. The contract between the National Lead Company and the P & D Coal Mining Company provided, among other stipulations, the following:

"*Term of This Agreement*

"The term of this agreement shall be for the period from July 1, 1955, to and including June 30, 1956, provided, however, that the Company, with the prior written approval of the Commission, shall have the option to renew this agreement, and an option to renew any such renewal, for another year upon the same terms and conditions by serving a written notice upon the Seller on or before thirty (30) days prior to the expiration of the agreement term or any renewal thereof; provided, further, however, that the Seller may terminate this agreement by a written notice to the Company not less than sixty (60) days prior to the expiration of the agreement term or any renewal thereof. * * *

"The quantity of coal which the Seller agrees to sell and the Company agrees to buy under the terms of this agreement shall not be less than ten thousand (10,000) tons (net ton of 2,000 pounds) or exceed fifty thousand (50,000) tons except by mutual agreement of the parties hereto."

On December 23, 1955, after failing to get the National Lead Company to agree to a price increase, the P & D Coal Mining Company informed the National Lead Company that it would not deliver any coal in excess of 10,000 tons. Thereafter, the National Lead Company informed the Coal Company that its Company would obtain its coal requirements from other sources and hold the Coal Company liable for any excess costs incurred by it up to the 50,000 tons mentioned in the contract. Subsequently, after the National Lead Company purchased the additional coal at an excess cost of $19,873.45, it assigned its alleged claim under the contract to the United States, and the Government, as such assignee of the rights and obligations under the contract between the original parties, instituted this suit for $19,873.-45 for damages allegedly arising out of the Coal Company's breach of contract. In answer, the Coal Company filed a counterclaim for $2,204.53, plus interest, for amounts admittedly owed it on unpaid invoices.

After hearing, the district court held that the contract, by virtue of the terms above quoted, gave the P & D Coal Mining Company the right to terminate the contract at any time up to 60 days prior to its expiration; that it had so terminated the contract; and that, accordingly, it did not owe the extra costs incurred by the National Lead Company in purchasing coal from other sources. Furthermore, the court held that while the United States, normally, cannot be held liable for interest unless there is express consent therefor in a statute or in the contract between the parties, that rule is not applicable where, as in this case, the United States first seeks enforcement under a claim assigned to it, against a private party, and that party then counterclaims against it; and that, in such a case, interest, as damages for the withholding of money due the private party, may be awarded on the counterclaim.

■ The Government was not a party to the contract. It mentioned that the National Lead Company had entered into a contract, referred to as the "Principal Contract," with the United States of America, represented by the United States Atomic Energy Commission, and that, in furtherance of the "Principal Contract," the Company desired to purchase coal from the P & D Coal Mining Company. It was stated and agreed in the contract that the purchase order for the coal was entered into by the National Lead Company for and

on behalf of the Government; that title to the coal furnished by the P & D Coal Mining Company should pass directly from the Coal Company to the Government, as purchaser, at the point of delivery; and that the National Lead Company was authorized to, and would, make payment thereunder from government funds advanced and agreed to be advanced to it by the Commission and not from its own assets; and would administer the purchase order in other respects for the Government. However, regardless of the references to the Government in the contract, the contract was an agreement between the National Lead Company and the P & D Coal Mining Company; and it was signed by those contracting parties through their lawful agents. It may be added that the contract showed that it was approved by the United States Atomic Energy Commission. Irrespective of the fact that this purchase order for the coal was understood to be entered into by the National Lead Company for and on behalf of the Government; that title to all supplies furnished thereunder by the P & D Coal Mining Company would pass directly from it to the Government; and, that the National Lead Company was authorized to, and would, make payment thereunder from government funds advanced by the Government, and administer the purchase order for the Government, nevertheless the contract can, in no sense, be characterized as a contract between the P & D Coal Mining Company and the Government.

The National Lead Company was, by the terms of the agreement, given the right to terminate the contract with the P & D Coal Mining Company under certain circumstances. The Government had no right to bring a suit for damages under the contract; and the P & D Coal Mining Company had no right, under the contract, to sue the Government for any sums due on coal delivered. The Government was not, under any possible construction, one of the contracting parties, and, by securing an assignment from the National Lead Company and suing upon it, was not relieved of liability for interest on the proved counterclaim of the P & D Coal Mining Company for coal already delivered under its contract with the National Lead Company.

■ Under the terms of the agreement between the National Lead Company and the P & D Coal Mining Company, above quoted, it is our conclusion that the Coal Company had the right to terminate the contract at any time up to 60 days prior to its expiration, and that such right was properly exercised. As to the claim that the Government, in this case, is not liable for interest, we agree with the holding of the district court that the Government's claim was based upon an assignment from the National Lead Company, and that the obligations of the original parties to the contract are not altered by the mere assignment of those rights and obligations to the Government.

In accordance with the foregoing, the judgment of the district court is affirmed upon the opinion of Judge Brooks, reported in D.C., 251 F.Supp. 1005.

PHILLIPS, Circuit Judge (dissenting).

This case involves the construction of a "maximum-minimum" contract for the purchase and sale of not less than ten thousand nor more than fifty thousand tons of coal.

An excellent description of this type of contract appears in Taggert v. Brimfield, 281 F. 830, 831 (C.A. 3, 1922):

> "Contracts of this general type are common, where a manufacturer has to provide in advance for a supply of some needed material, the exact amount of which he cannot then specify. In this uncertainty, he names a minimum, which on his part he positively agrees to take, and he names a maximum up to, but not beyond, which the seller is bound to furnish. In this way, both parties are protected. The seller has insured an absolute sale of a definite,

minimum amount, which the buyer is bound to take, no matter whether he needs it or not. So, also, in consideration of such present minimum sale, which the seller then makes, he agrees on his part to furnish a further quantity up to the maximum, if the buyer requires it."

In Crystal Paper Co. v. Robertson Co., 289 F. 15, 16–17 (C.A. 6, 1923), this court quoted with approval the foregoing language from Taggert v. Brimfield, and stated the rule for construing such a contract as follows:

"In the absence of express contract provision therefor, there is no hard and fast rule that the seller, merely because he is such, nor, on the other hand, that the buyer, simply because he is the buyer, has the option to determine the amount to be supplied. The ultimate question is one of intention, to be determined largely upon the facts and circumstances of each particular case. The practical question is: 'For whose protection was the option reserved?'"

Williston states the rule in this language:

"Sometimes the contract states a minimum and maximum quantity, and it becomes a matter of interpretation to determine which party has the option of fixing the quantity between the stated limits. If the facts clearly show that the provision must have been intended for the benefit of one party, that party has the option." 2 Williston, Sales, § 464 at 738 (Rev. Ed.).

The contract in the present case was gauged to the needs of the buyer, National Lead Company. I construe the maximum-minimum provision to have been intended for the benefit of the buyer. Under this interpretation National Lead was obligated to buy a minimum of 10,000 tons of coal and had the option to require delivery of more coal at the same price, up to a maximum of 50,000 tons. P & D was bound to deliver up to 50,000 tons at the option of National Lead.

The majority decision holds that the language in the "Term of This Agreement" provision (quoted in the majority opinion) gave P & D an absolute right to terminate the agreement at any time up to sixty days prior to its expiration. With utmost deference I disagree with this interpretation. I construe the cancellation provision to relate only to the renewal or non-renewal of the contract.

This provision states, first, that the "agreement shall be for the period from July 1, 1955, to and including June 30, 1956." Secondly it proceeds to say: "provided, however," that National Lead shall have an option to renew the agreement and an option to renew any such renewal by "serving a written notice upon the Seller [P & D] on or before thirty (30) days prior to the expiration of the agreement term or any renewal thereof." Finally, the same paragraph proceeds to say: "provided, further, however, that the Seller [P & D] may terminate this agreement by a written notice to the Company [National Lead] not less than sixty (60) days prior to the expiration of the agreement term or any renewal thereof."

Under the interpretation placed upon this provision by the majority, P & D could have terminated the agreement herein at any time up to sixty days prior to expiration, without notice. This would mean that National Lead could have been left abruptly with no coal to supply its continuing requirements. I do not believe that such a result was contemplated by the parties.

As said by the Supreme Court in construing a contract in Miller v. Robertson, 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed. 265:

"The intention of the parties is to be gathered, not from the single sentence * * *, but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution."

This court, speaking through Judge Hicks in Kenyon v. Automatic Instru-

ment Co., 160 F.2d 878, 883 (C.A. 6, 1947) said:

"[T]he construction of a contract which is reasonable, fair and just will prevail over one that is unusual and extraordinary. Stoddart v. Golden, 179 Cal. 663, 178 P. 707, 3 A.L.R. 1060."

In Liberty National Bank & Trust Co. v. Bank of America Nat. T. & S. Ass'n, 218 F.2d 831, 840 (C.A.10, 1955) the court stated the applicable rule of construction as follows:

"The primary function of judicial interpretation is to ascertain and give effect to the intention of the parties as expressed in their writing. And the basic rule of universal acceptation for the ascertainment of such intention is for the court, so far as possible, to put itself in the place of the parties when their minds met upon the terms of the agreement, and, taking into consideration the writing itself, its purpose, and the circumstances leading up to and attending its execution, endeavor to ascertain what the parties purposed and intended by their agreement. Where the language contained in an agreement is contradictory, obscure, or ambiguous, or where the meaning of an agreement is doubtful, so that the contract is fairly susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally enter into, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the former interpretation must be preferred to the latter."

Reading the contract as a whole, I am convinced that it was not the intention of the parties to give P & D the right to cancel the agreement at will and without notice at any time sixty days prior to expiration. The fact that a continuing source of supply was contemplated is demonstrated by the invitation to bid, which set forth an estimated delivery schedule of 3,000 to 5,000 tons per month and an estimated total requirement of 46,000 tons.

Additionally, the interpretation adopted by the majority opinion virtually nullifies the default provisions of the contract.[1] An interpretation which gives meaning and effect to all the provisions of a contract is preferred to one which leaves a portion of the contract useless or of no effect. 17 Am.Jur.2d, Contracts, § 259; Restatement, Contracts, § 236 (1932).

I construe the "Term of This Agreement" provision, quoted in the majority opinion, to mean simply that, unless renewed, the contract was to remain in effect for a period of one year. P & D had the right, upon sixty days notice, to nullify National Lead's thirty-day option to renew. In this way P & D was given the right to avoid having National Lead renew the contract for another one-year

---

[1]. "Default

"(a) The Company may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Seller terminate the whole or any part of this Order in any one of the following circumstances:

"(1) If the Seller fails to make delivery of the supplies or perform the services within the time specified herein or any extension thereof; or

"(2) If the Seller fails to perform any of the other provisions of this Order, or so fails to make progress as to endanger performance of this Order in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of ten (10) days (or such longer period as the Company may authorize in writing) after receipt of notice from the Company specifying such failure.

\* \* \* \* \*

"(c) In the event the Company terminates this Order in whole or in part as provided in (a) of this paragraph, the Company may procure, upon such terms and in such manner as the Company may deem appropriate, supplies or services similar to those so terminated, and the Seller shall be liable to the Company for any excess costs for such similar supplies or services; provided, that the Seller shall continue the performance of this Order to the extent not terminated under the provisions of this paragraph 10."

period. This interpretation would give both parties a reasonable time to make plans for the ensuing year in event of non-renewal or termination.

Further, I respectfully dissent from that part of the holding of the majority which affirms the action of the district court in allowing prejudgment interest against the United States. The district court entered judgment for interest from the date the debt was assigned to the United States by National Lead.

It is the general rule that interest is not recoverable on claims against the United States whether arising from contract or tort, in the absence of a statute providing for interest, or some special act on the part of the United States waiving its immunity and consenting to be liable for interest. United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577; United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521; Tillson v. United States, 100 U.S. 43, 25 L.Ed. 543; Gray v. Dukedom Bank, 216 F.2d 109 (C.A. 6).

In the instant case the United States brought this action under 28 U.S.C. § 1345. P & D's counterclaim is founded upon the Tucker Act, 28 U.S.C. § 1346 (a) and (c). 28 U.S.C. § 2411(b) [2] and 31 U.S.C. § 724a [3] govern the award of interest with respect to such a counterclaim. These statutes prescribe the period during which interest may be allowed against the United States. While the Court in N. Y. Rayon Importing Co., supra, had before it a different section of the code, the reasoning of that case impresses me as being applicable here.

The district court based its holding upon the decision in United States v. The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313. The decision was rendered before the enactment of the Public Vessels Act of 1925, 46 U.S.C. § 782, and I do not consider it to be controlling in the present case in view of the explicit provisions of the statutes quoted in the second and third footnotes. See United States v. Petroleum Nav. Co., 109 F.2d 699 (C.A. 2, 1940).

If the contract in the present case had been executed directly between the United States and P & D, no prejudgment interest would be recoverable. I do not agree with the holding that the United States is liable because it assumed the debt of a private party by virtue of the assignment.

The procurement contract provided that it was:

"understood and agreed that this Purchase Order is entered into by Company [National Lead] for and on behalf of the Government; that title to all supplies furnished hereunder by the Seller [P & D] shall pass directly from the Seller [P & D] to the Government, as purchaser, at the point of delivery; that the Company [National Lead] is authorized to and will make payment hereunder from Government funds advanced and agreed to be advanced to it by the Commission and not from its own assets, * * *."

---

2. § 2411. Interest.
"(b) Except as otherwise provided in subsection (a) of this section, on all final judgments rendered against the United States in actions instituted under section 1346 of this title, interest shall be computed at the rate of 4 per centum per annum from the date of the judgment up to, but not exceeding, thirty days after the date of approval of any appropriation Act providing for payment of the judgment."

3. § 724a. Appropriations for payment of judgments and compromise settlements against the United States.

"[W]henever a judgment of a district court to which the provisions of section 2411(b) of Title 28 apply, is payable from this appropriation, interest shall be paid thereon only when such judgment becomes final after review on appeal or petition by the United States, and then only from the date of the filing of the transcript thereof in the General Accounting Office to the date of the mandate of affirmance (except that in cases reviewed by the Supreme Court interest shall not be allowed beyond the term of the Court at which the judgment was affirmed): * * *."

The Atomic Energy Commission signed and approved the contract. Express provision was made for assignment to the Atomic Energy Commission or its designee. P & D could not have been unaware that the contract was executed for the procurement of coal under the authority of and for the benefit of the Atomic Energy Commission.

Even if the majority is correct in its interpretation of the cancellation clause of the contract, I would hold that the district court erred in allowing prejudgment interest against the United States.

I would reverse and remand with instructions to enter judgment in favor of the United States.