UNITED STATES of America, Appellee,

v.

DAVISON FUEL AND DOCK COMPANY, a Corporation, Appellant.

No. 10567.

United States Court of Appeals Fourth Circuit.

Argued Nov. 3, 1966.

Decided Jan. 6, 1967.

David W. Matthews, Cincinnati, Ohio (John H. Clippinger, Wilbur L. Collins, Cincinnati, Ohio, David D. Johnson, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., and Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief), for appellant.

Robert V. Zener, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., David L. Rose, Atty., Dept. of Justice, and Milton J. Ferguson, U. S. Atty., on brief), for appellee.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Mine workers in West Virginia were paid lower wages than the minimum established under provisions of the Walsh-Healey Public Contracts Act, 41 U.S.C.A. Sections 35–45. The United States, for the benefit of the miners, sued to compel Davison Fuel and Dock Company to pay each miner the difference between what he received and what he would have received had wages complied with standards set under authority of the Act.[1]

The district court decided that Davison had sufficient contractual relationship with the United States to invoke provisions of the Walsh-Healey Act and entered judgment for the use and benefit of the miners. We affirm.

Although the facts are stipulated, it is necessary to an understanding of the problem to set them out in some detail.

National Lead contracted to operate on a cost-plus-a-fixed-fee basis the Atomic Energy Commission's Feed Materials Production Center at Fernald, Ohio. The contract provided, *inter alia*, that National Lead should acquire for the Government necessary materials which had not been furnished by the AEC and that payment for such materials was to be made from government funds deposited in special accounts. The Government reserved the right to require purchase orders to be submitted for its approval. Under the contract title to all materials purchased was to pass directly from the vendor to the Government.

Appellant, Davison,[2] entered into two purchase order contracts exceeding $700,000 in combined amount, to supply coal over a period of two years for the operation of the Fernald facility.

The contracts provided that Davison "shall produce (or arrange to have produced) * * *" the coal and "shall deliver coal from the source at the rate specified by the agreement and in the

---

1. It is stipulated that workers at the thirty-two different mines were underpaid $93,603.29 and that if the Act is applicable the United States is entitled to recover this amount.

2. Davison entered into the contracts under its name at that time, Raymond City Coal and Transportation Company.

schedule(s)." The coal was "not (to) be delivered * * * from any other source * * * than set forth * * *" in the attached schedules. The schedules named the source as a particular mine at Crown Hill, West Virginia, operated by Riverton Coal Company. Riverton was a wholly-owned subsidiary of Fields Creek Coal Company, which was itself a wholly-owned subsidiary of Davison.

Davison operated no coal mines *directly* but owned and operated truck scales, a tipple, coal processing plant, and barge loading facility at Marmet, West Virginia. At North Bend, Ohio, Davison maintained a river harbor, including barge unloading facilities, coal processing plant, storage yard, and rail and truck shipping facilities. In addition, Davison owned coal producing properties in the vicinity of Marmet, West Virginia, which it leased to various mine operators.

The coal actually delivered by Davison under the purchase order contracts originated from three sources: the Riverton Coal Company, the designated source; Fields Creek Coal Company; and thirty-two other non-affiliated producers whose employment practices, as stipulated, did not comply with the minimum wage and overtime requirements of the Walsh-Healey Act. Although the Riverton mine produced a sufficient amount of coal to meet Davison's obligation under the contracts, Davison, apparently in accord with practices in the industry, purchased and intermingled coal from other producers in fulfilling its general contract obligations. To meet the specifications of the purchase orders, the raw coal before delivery had to be processed by screening, picking and crushing. This was accomplished in facilities of either Davison or its subsidiary, the Riverton Coal Company.

## I.

The stipulations and representations required by the Walsh-Healey Act and liability for their violation are applicable only to "any contract made and entered into by any executive department, independent establishment, *or other agency or instrumentality* of the United States * * *." 41 U.S.C.A. § 35. (Emphasis added.) A predicate, therefore, to liability on the purchase order contracts here in issue is that they be found, for purposes of the Act, to be "government contracts." Davison contends the contracts were between it and National Lead, two private corporations, and hence, not within the reach of the Walsh-Healey provisions.

National Lead is, indeed, a private corporation. But here it was acting as an agent of the AEC, an instrumentality of the Government, in purchasing necessary supplies for operation of the AEC Fernald facility. For purposes of the Walsh-Healey Act, we think the contracts were "made and entered into" by the AEC, admittedly an instrumentality of the United States, and the purchases were those of the Government. Cf. United States v. Livingston, 179 F.Supp. 9 (E. D.S.C.1959), aff'd mem., 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960).

Both contracts were in the form of agreements between National Lead and Davison. Each contained, however, express stipulations that it was entered into by National Lead for and on behalf of the Government; that shipments of the coal were to be made to the United States Atomic Energy Commission, % National Lead Company; and that title to the coal was to pass directly to the Government *as purchaser*. The contracts were not to be binding without written approval of the AEC and were, in fact, signed by AEC contracting officers.

The purchase order contracts contained many standard clauses included and in some instances required to be in government contracts.[3] The contracts specifi-

---

3. Included, among others, were clauses providing for termination of the contract when determined in the best interests of the Government; requiring settlement of disputes by submission to the government contracting officer, with right of appeal to the AEC; giving the right to the Comptroller General to examine books.

cally provided for incorporation by reference of the representations and stipulations of the Walsh-Healey Act, including applicable rulings and interpretations of the Secretary of Labor.

The coal was to be paid for from funds advanced by the Government and segregated for this purpose by National Lead which was to acquire no right or interest in them. The Government remained liable *directly* if for any reason payment was not made.

■ The contracts plainly impose the ultimate liability and risk in the purchase transaction on the Government. Davison can express no surprise that the Government's status is that of purchaser for it was named as such in the contracts. The United States was sufficiently a party to the contracts with Davison to support the conclusion of the district judge that they were made by a government instrumentality within the meaning of the Walsh-Healey Act.

Davison urges on us in support of its position the decisions of the Supreme Court in United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), and Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). However, these are not pertinent for they determine only that the companies involved were not to be considered constituent parts of the Government. Here, the United States does not claim that National Lead was a part —agency or instrumentality—of the Government, but only that National Lead was being compensated in its private corporate capacity as a purchasing agent for the AEC. This arrangement was a lawful delegation of authority whereby National Lead served as government purchasing agent. See United States v. Livingston, supra, 179 F.Supp. at 21.

Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), also cited by Davison, is distinguishable from the present case. There the purchaser of materials was held to be the private contractor and not the Government; however, the purchase order specifically stated that it did "not bind, nor purport to bind" the Government. In addition, the private contractor paid for the materials initially with his own funds, subject to reimbursement, and title passed to the Government only after written acceptance by the United States contracting officer. "Meanwhile, title to materials was in the contractor, who had purchased them on his own credit and who, presumptively, could have diverted them to other purposes." United States v. Livingston, supra, 179 F.Supp. at 21. A result contrary to that in *King & Boozer* was reached in Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), where on contractual terms more nearly like those in the present case the Government was held to be the actual purchaser and the private contractor its purchasing agent.

■ Moreover, *King & Boozer,* as *Boyd,* supra, and indeed, *Kern-Limerick,* dealt with problems of immunity from state taxation which involved consideration of different policies than in the case now before us. The Walsh-Healey Act is remedial wage and hour legislation and will be construed liberally to effectuate congressional policy "that the Federal Government should procure and use only goods produced under safe and fair working conditions." George v. Mitchell, 108 U.S.App.D.C. 324, 282 F.2d 486, 493 (1960). The Act will be interpreted to further its purpose "to obviate the possibility that any part of our tremendous national expenditures * * * go to forces tending to depress wages and purchasing power and offending fair social standards of employment." Perkins v. Lukens Steel Co., 310 U.S. 113, 128, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940).

The divergence of relevant policies and difference in the contexts in which the

and documents of Davison pertinent to the orders; prohibiting discrimination in employment; covenanting against contingent fees; providing that members of

Congress would not share in benefits; and agreeing to adhere to the terms of the Buy American Act.

issues arise also assist to explain what may appear to be a conflict between our decision in this case and a decision of the Sixth Circuit on the question of whether substantially similar purchase orders were government contracts. See United States v. P & D Coal Mining Co., 358 F. 2d 619 (6th Cir. 1966).

*P & D Coal Mining* also involved the contracting status of National Lead as the manager of AEC's Fernald facility. A divided court held that the United States, having sued P & D after taking an assignment of National Lead's rights under a coal purchase order similar to those in contention here, was chargeable for pre-judgment interest on P & D's successful counterclaim on the order. This was so, the court held, even though interest on all final judgments against the United States on claims under the Tucker Act, under which suit was brought,[4] was to be computed only from the date of judgment. The panel imposed liability on the Government for pre-judgment interest due from National Lead after finding that the United States was *not* a party to the original purchase order contract but was suing as assignee of the private contract between P & D and National Lead. Id. at 620.

The Sixth Circuit in *P & D Coal Mining*, in deciding that the Government was not a party to the contract,[5] relied on the fact that P & D "had no right, under the contract, to sue the Government for any sums due on coal delivered." Id. at.

621. In the present case, on the other hand, the Government *was* ultimately liable for payment to Davison if for any reason payment was not made from sums advanced to National Lead.[6] In addition, the Sixth Circuit noted that the contract there "showed that it was approved by the" AEC. Ibid. The purchase order contracts entered into with Davison in the present case were by their terms "not * * * binding unless so approved," and thus, the very existence of the legal obligation was contingent upon the written concurrence of the AEC.

## II.

The Walsh-Healey Act is expressly applicable only to primary government contracts and does not purport to affect the labor standards of subcontractors. 41 U.S.C.A. § 35. We agree with the United States, however, that Congress did not intend that Walsh-Healey provisions be circumvented by use of the prime contract as a means to insulate from the requirements of the Act the firms actually performing work that would normally be done by the prime contractor.

The Act, to prevent such circumvention, requires in each government contract (incorporated by reference in the present purchase orders) a stipulation that the "contractor is the *manufacturer of* or a *regular dealer in* the materials * * * to be manufactured or used in the performance of the contract." 41 U.S.C.A. § 35. (Emphasis added.)[7] We believe the administrative rulings dealing with sub-

---

4. P & D's counterclaim was founded on the Tucker Act, 28 U.S.C.A. § 1346(a), (c). 28 U.S.C.A. § 2411(b) and 31 U.S. C.A. § 724(a) provide for interest in respect to judgments on such claims, but not for pre-judgment interest.

5. This precise question, according to counsel for the United States, was not briefed or argued to the Sixth Circuit.

6. Both purchase order contracts in the present case provided specifically "that nothing herein shall preclude liability of the Government for any payment properly due hereunder if for any reason such payment is not made by the Company * * *" from the funds advanced to National Lead.

7. The House of Representatives Report on the Walsh-Healey legislation stated the purpose of this provision to be "to eliminate the evil of bid brokerage and bid peddling. * * * (M)any persons who were not legitimate dealers nor manufacturers made a practice of bidding for Government contracts by submitting estimates so low that none of the well-established concerns in the field could successfully compete against them. These brokers then sublet various portions of the contract to sweat shops and substandard factories * * *." H.R.Rep. 2946, 74th Cong., 2d Sess. at 4 (1936).

stitute manufacturers applied by the Department of Labor in the present case [8] represent a reasonable interpretation of this statutory policy and are well within the Secretary's authority to "make * * * such rules and regulations as may be necessary to carry out the provisions of * * *" the Walsh-Healey Act. 41 U.S.C.A. § 38; see United States v. New England Coal and Coke Co., 318 F.2d 138, 147 (1st Cir. 1963); cf. American Trucking Ass'ns, Inc. v. United States, 344 U.S. 298, 310, 73 S.Ct. 307, 97 L.Ed. 337 (1953).

 These rulings impose on one with a government contract for the manufacture of materials joint liability for failure of another manufacturer to which he has shifted the work to comply with Walsh-Healey standards. Rulings imposing liability for the omissions of substitute manufacturers were first issued in 1937, only a year after the passage of the Walsh-Healey Act.[9] They have been since consistently applied by the Secretary of Labor [10] and have not been altered by Congress, notwithstanding several amendments to the original Act and frequent congressional inquiries concerning the Act and its administration by the Department of Labor.[11] We think that the present situation is one in which congres-

8. Section 31(a), Department of Labor, Rulings and Interpretations No. 3 under Walsh-Healey Public Contracts Act provides:

"*Substitute Manufacturer.*—(a) When a contractor holding a contract under the Public Contracts Act for the manufacture of materials, supplies, articles, or equipment causes another party to produce all or some of the commodities called for by the contract, the producer of those commodities, not produced by the primary contractor, is deemed to be a 'substitute manufacturer'."

Section 32(a), Rulings and Interpretations No. 3, provides:

"*Liability of the Primary Contractor.*—(a) When a contractor undertakes a contract subject to the Public Contracts Act, he assumes an obligation to manufacture or furnish the commodities required under the labor standards of the Act. He may not relieve himself of this obligation merely by shifting the work to another. If, for example, a contractor is awarded a contract subject to the Act as a manufacturer, that contractor is liable jointly with the substitute manufacturer for any acts or omissions on the part of a substitute manufacturer which would have constituted violations of the contractor's contract if he had performed the contract in his own plant and had committed such acts or suffered such omissions in connection with that performance."

9. The initial ruling provided:
"*Substitute manufacturer.*—When a manufacturer undertakes a contract subject to the Act he assumes an obligation to produce the commodities required under the labor standards of that Act. He may not relieve himself of this obligation merely by shifting the work to another." 2 Fed.Reg. 1926 (1937).

10. Since 1937, the Secretary of Labor (or his delegate) has consistently held that those who contract with the Government *as manufacturers* are responsible for the labor standards of the employees who actually do the work under the contract, whether or not they are the prime contractor's employees. E. g., Admoor Clothes, 6 Wage & Hour Cas. 1073 (1944); Cohen-Fein Co., 6 Wage & Hour Cas. 1116, 1118 (1940). Similarly, he has consistently ruled that those who contract as coal producers are responsible for the labor standards of the mines from which they purchase coal to fulfill their government contracts. In re Jno. McCall Coal Co., 15 Wage & Hour Cas. 523 (1962); In re Simmons, 14 Wage & Hour Cas. 546, aff'd, 14 Wage & Hour Cas. 682 (1960); In re McPherson, 13 Wage & Hour Cas. 743, aff'd, 13 Wage & Hour Cas. 763 (1958); In re Bradford Coal Co., 13 Wage & Hour Cas. 225 (1957).

11. In the first six years under the Act, eight proposals for amendment were the subject of hearings and were favorably reported by committees of Congress. H.R. 4579, H.R.Rep. No. 1933 and S.Rep. No. 1264, 77th Cong., 2d Sess. (1942); H.R. 9822, H.R.Rep. Nos. 2257 and 2706 and S.Rep. No. 1863, 76th Cong., 3d Sess. (1940); H.R. 8026, H.R.Rep. No. 1593 and S.Rep. 1615, 76th Cong., 3d Sess. (1940); S. 1970, S.Rep. No. 901, 76th Cong., 1st Sess. (1939); S. 1032, S.Rep. No. 616, 76th Cong., 1st Sess. (1939); S. 2165, S.Rep. No. 1810, 75th Cong. 3d Sess. (1938); H.R. 9218, H.R.Rep. No. 1899 and S.Rep. No. 1611, 75th Cong., 3d Sess. (1938); H.R. 6449, H.R.Rep. No. 2608, 75th Cong., 3d Sess. (1938). Four

sional failure to act may be deemed to evidence congressional acquiescence. See, e.g., Ruth Elkhorn Coals, Inc. v. Mitchell, 101 U.S.App.D.C. 313, 248 F.2d 635 (1957), cert. denied, 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530 (1958); Mitchell v. Covington Mills, Inc., 229 F.2d 506 (D.C.Cir.1955), cert. denied, 350 U.S. 1002, 76 S.Ct. 546, 100 L.Ed. 865 (1956).

The substitute manufacturer rulings help insure compliance with the fundamental Walsh-Healey policy that performance of work under government contracts will be at fair wages and in safe working conditions. The prime contractor may not escape Walsh-Healey responsibility by shifting to others work it has contracted to perform itself.

Even so, the substitute manufacturer rulings do not extend Walsh-Healey standards to government subcontracts generally.[12] This concededly would be in excess of the Secretary's statutory authority under the Act. United States v. New England Coal and Coke Co., 318 F.2d 138 (1st Cir. 1963).

█ Davison urges that the Secretary may not ever extend protection to em-

ployees other than those of the prime contractor because the Act plainly embraces only persons "employed by the contractor." 41 U.S.C.A. § 35(b), (c). In view of the history of administration of the Act and the frequent opportunity of the Congress to correct administrative interpretation, we think "employed" as used in the statute has acquired the meaning given it in the Secretary's rulings. Persons "employed by the (prime) contractor" may be, in carefully defined situations, persons other than those on the prime contractor's payroll. We do not believe this to be in conflict with the position of the First Circuit in New England Coal and Coke Co., supra, for the court there carefully distinguished situations in which the substitute manufacturer rulings are properly invoked.

### III.

Davison argues that the substitute manufacturer rulings of the Secretary of Labor are not applicable to it in any event because it is a "regular dealer" in coal and not a "manufacturer" as that term is used in the Walsh-Healey Act and in the pertinent administrative regulations and rulings and interpretations.[13] Thus,

of these were enacted into law. Act of May 13, 1942, ch. 306, 56 Stat. 277 (now codified in 41 U.S.C.A. § 35(c)); Act of June 28, 1940, ch. 440, § 13, 54 Stat. 681 (now codified in 41 U.S.C.A. § 40); Act of June 14, 1940, ch. 364, § 8, 54 Stat. 395 (now codified in 10 U.S.C.A. § 7299); Act of May 17, 1938, ch. 243, § 12, 52 Stat. 403. After the Second World War the Walsh-Healey Act again received extensive congressional consideration and was subject to major amendments. See Act of June 30, 1952, ch. 530, § 301, 66 Stat. 308 (now codified in 41 U.S.C.A. § 43a) (Fulbright Amendment); Portal-to-Portal Act of 1947, ch. 52, 61 Stat. 84 (now codified, as amended, in 29 U.S.C.A. § 259).

12. Section 30(a), Department of Labor, Rulings and Interpretations No. 3 under Walsh-Healey Public Contracts Act provides:

"Subcontractor.—(a) If a manufacturer buys materials, supplies, articles, or equipment to be used in manufacturing the commodities required by the Government contract, and if it is the regular practice in the industry en-

gaged in the manufacture of the commodities called for by the contract to purchase such materials, supplies, articles, or equipment and not to manufacture them, the vendor of such goods is considered a 'subcontractor' and the work performed by him is not deemed subject to the Public Contracts Act." (Emphasis added.)

13. The regulations issued under the Walsh-Healey Act provide the following general definitions to determine initial qualification to contract under the Act:

"(A) manufacturer is a person who owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications." 41 C.F.R. § 1–12.603–1. (Emphasis added.)

"(A) regular dealer is a person who owns, operates, or maintains a store, warehouse, or other establishment in which materials, supplies, articles, or equipment of the general character described by the specifications and re-

Davison asks us to reverse the conclusion of the district court that it bid and contracted in the present instance as a manufacturer, and was, therefore, bound by this status in the application of the Act.

Davison in the present contracts agreed to "produce (or arrange to have produced) and sell coal," and in the words of the district judge below, "it would be extremely difficult to classify Davison as a dealer for the basic reason that through its two wholly owned subsidiaries it does mine, process and deliver coal." Moreover, Davison contracted expressly to supply the coal from its subsidiary, the Riverton Coal Company.

■ That Davison and its subsidiaries are separate legal entities does not preclude consideration of them as an integrated production structure for the purpose of enforcing Walsh-Healey provisions. In applying regulatory statutes such as the Walsh-Healey Act, separate corporate entities are not inviolate. See, e.g., H. P. Lambert Co. v. Secretary of the Treasury, 354 F.2d 819, 822 (1st Cir. 1965); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28, 37 (1950). It was stipulated that Davison owned all the stock in Fields Creek Coal Company, which in turn owned all the stock in Riverton, and that substantially all the coal which Riverton mined or otherwise handled was delivered to Davison. There was in addition at the time of execution of the present contracts substantial identity of officers in the companies. Davison also represented itself as sales agent for both Riverton and Fields Creek.

■ We agree with the district judge that Davison in entering into the present contracts did so as a "manufacturer" for purposes of application of the Walsh-Healey Act and the Secretary's administrative rulings. Hence, the holding of the First Circuit in *New England Coal and Coke Co.*, supra, is inapposite for the court there held "that the Walsh-Healey Act does not make a contractor, who *enters into a contract* to furnish goods to the government *as a regular dealer* and operates as such in the performance of its contract, responsible for the labor standards of its suppliers." 318 F.2d at 148. (Emphasis added.) The court expressly distinguishes circumstances involving the substitute manufacturer regulations which are applied to "prevent evasion by the prime contractor of its Walsh-Healey obligations." Id. at 147.

IV.

■ The district court held that the non-affiliated producers of coal whose labor conditions failed to meet Walsh-Healey standards were substitute manufacturers and *not* subcontractors for whose omissions Davison would not have been liable under the rulings of the Secretary.[14] We agree.

As was said by the district judge, "it would be stretching the imagination rather far to say that because Davison processed (screened, picked, crushed) coal purchased from various 'pothole' mines, they were, in effect, purchasing materials, etc. and manufacturing them into a finished product for delivery under the contracts." Cf. East Texas Motor Freight Lines, Inc. v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1956). Rather, Davison, had contracted to "produce (or arrange to have produced) and sell coal" of a certain specification and had instead shifted responsibility to substandard parties "to produce all or some of the * * * (very commodity) called for by the contract * * *." Section 31(a), Department of Labor, Rulings and Interpretations No. 3 under Walsh-Healey Public Contracts Act.

quired under the contract are bought, kept in stock, and sold to the public in the usual course of business." 41 C.F. R. § 1–12.603–2. (Emphasis added.)

14. See note 7, supra, for the Secretary's rulings defining "substitute manufactur-

er" and the primary contractor's liability for his omissions; and see note 11, supra, for the Secretary's ruling defining "subcontractor" and stating the inapplicability of the Act to him.

■ Here, as with our consideration above of the question of whether Davison was a manufacturer or regular dealer, we note the rule that an agency's interpretation of its own regulations should be accepted by the courts unless shown to be unreasonable or inconsistent with underlying statutory authority. Udall v. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock Co., 325 U.S. 410, 413, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

## V.

■ Finally, Davison asserts that there can be no liability on the purchase order contracts in question because incorporation by reference of Walsh-Healey provisions in them [15] "conflicts with the clear legislative command of the Act that 'there shall be included' the representations and stipulations (41 U.S.C.A. § 35)." The standard incorporating clause is currently set out in 41 C.F.R. Section 12.605. The administrative construction of the Act since 1942 has authorized incorporation by reference. See 7 Fed. Reg. 11086 (1942). Moreover, the courts have sustained incorporation by reference, albeit without challenge. E.g., Harp v. United States, 173 F.2d 761 (5th Cir. 1949), cert. denied, 338 U.S. 816, 70 S.Ct. 56, 94 L.Ed. 494 (1949). We believe this practice to be reasonable and not inconsistent with the terms of the statute.

■ Davison also objects to the conditional nature of the incorporating clauses in the present contracts. This objection is without merit since the Walsh-Healey Act itself provides for administrative proceedings to determine the applicability of the Act to any particular contract. 41 U.S.C.A. §§ 39, 43a. We agree with counsel for the United States that the conditional wording accurately reflects the legal situation and, indeed, prevents the contractor from being misled into believing that the inclusion of the clause precludes him from contesting the applicability of the Act to his contract.

We perceive no error in the findings or conclusions of the district court and, therefore, the judgment below for the United States is

Affirmed.

---

15. One purchase order provides that:
"to the extent that this Order is subject to the Walsh-Healey Public Contracts Act * * * there are hereby incorporated by reference all representations and stipulations required by said Act and regulations issued thereunder by the Secretary of Labor, such representations and stipulations being subject to all applicable rulings and interpretations of the Secretary of Labor which are now or may hereafter be in effect."
The second provides that:
"if this order is for the manufacture or furnishing of materials, supplies, articles, or equipment in an amount which exceeds or may exceed $10,000 and is otherwise subject to the Walsh-Healey Public Contracts Act * * * there are hereby incorporated by reference all representations and stipulations required by said Act and regulations issued thereunder by the Secretary of Labor, such representations and stipulations being subject to all applicable rulings and interpretations of the Secretary of Labor which are now or may hereafter be in effect."